**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| A METAL SOURCE, LLC, | ) | CASE NO.  1:14-cv-01020-DAP |
| | ) | |
| Plaintiff, | ) | JUDGE DAN AARON POLSTER |
| | ) | |
| vs. | ) | <u>OPINION AND ORDER</u> |
| | ) | |
| ALL METAL SALES, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

Before this Court is Defendants All Metal Sales, Inc. and Thomas G. Klocker's Motion to Dismiss and for Attorneys' Fees, Doc #: 36.  For the reasons stated below, this Motion is granted in part.

**I. Factual Background**

The facts, as alleged in the Complaint, are straight-forward.

A Metal Source, LLC ("A Metal") and All Metal Sales, Inc. ("All Metal") are competing metal distribution businesses.  Compl. ¶¶ 9, 10, Doc #: 1.  Jessica Esparza, the owner of A Metal, and Thomas Klocker, the owner of All Metal, are step-siblings.  *Id.* at ¶ 11.

A Metal has and uses trademarks such as "A Metal Source" and Internet domain names

such as "ametalsource.com." *Id.* at ¶¶ 19, 20.  On May 15, 2013, Klocker and employees of All

Metal registered twenty-eight domain names using a private registration service.  *Id.* at ¶ 21.

These domain names include names such as "ametalsourcellc.biz," "ametalsourcellc.com,"

"ametalsourceinc.biz," and "ametalsourceinc.com." *Id.*  They also registered sixty-three domain

names without using a private registration system.  *Id.* at ¶ 22.  These registrations occurred

while A Metal and All Metal were engaged in a separate state court litigation.  *Id.*


**II. Procedural Background**

The procedural history of this case is more involved.

**A. Series of Lawsuits**

Briefly summarizing the procedural history leading up to this motion,[1] the instant case is

the third in an "ongoing feud between Esparza and Klocker." *Esparza*, 27 N.E.3d at 25.  First, in

2010, All Metal sued A Metal for trademark infringement; A Metal prevailed and All Metal did

not appeal.  *See All Metal Sales, Inc. v. All Metal Source, LLC*, No. 1:10 CV 2343, 2012 WL

1831235, 2012 U.S. Dist. LEXIS 69513 (N.D. Ohio May 18, 2012).  Second, in 2013, A Metal

sued All Metal in state court alleging seven causes of action pertaining to alleged misconduct

related to the 2010 federal lawsuit (the "State Action").

---

[1] The history of this case has already been thoroughly described by this Court (*A Metal Source, LLC v. All Metal Sales, Inc.*, No. 1:14-CV-1020, 2014 WL 4245992, at *1–2, 2014 U.S. Dist. LEXIS 119606, at *1–5 (N.D. Ohio Aug. 26, 2014)), the Ohio Eighth District Court of Appeals (*Esparza v. Klocker*, 27 N.E.3d 23, 25–26 (Ohio Ct. App. 2015)), and the Sixth Circuit Court of Appeals (*A Metal Source, LLC v. All Metal Sales, Inc.*, 608 F. App'x 346, 347–48 (6th Cir. 2015)).  The Court declines to again revisit in detail the history of this case prior to the most recent Sixth Circuit appeal.

Third, on May 12, 2014, while a summary judgment motion was under consideration in the State Action, A Metal ("Plaintiff") filed the instant case against All Metal and Thomas Klocker ("Defendants") in this Court.  The instant Complaint alleges two Lanham Act claims: cybersquatting under the Anti-Cybersquatting Consumer Protection Act ("ACPA") and unfair competition, pursuant to 15 U.S.C. § 1125(d) and (a)(1) respectively.  Compl. ¶ 4.  In brief, the Complaint alleges that on May 15, 2013, Defendants registered at least twenty-eight Internet domain names which infringe upon Plaintiff's marks.  *Id.* at ¶¶ 21, 22.

### B. State and Federal Appeals

On June 2, 2014, the state court granted summary judgment in favor of All Metal in the State Action.  A Metal timely appealed.  On July 21, All Metal filed in the instant case a motion to dismiss the Complaint for failure to state a claim.  Doc #: 16.  On August 26, this Court granted that motion to dismiss on the basis of res judicata (i.e., claim preclusion).  Mem. of Opinion and Order, Doc #: 18.  Specifically, this Court held that since the conduct (i.e., domain name registrations) underlying the Lanham Act claims had been included in one or more of the claims in the State Action, the federal case was barred, under the principle of res judicata, by the state court grant of summary judgment.  *Id.*  Again, A Metal timely appealed.

On January 15, 2015, the state appellate court concluded that "[t]he trial court erred in granting a blanket protective order and quashing the first subpoena upon AT & T, dated January 14, 2014," sustained one assignment of error, reversed the state trial court's judgment, and remanded the State Action back to the trial court.  *Esparza*, 27 N.E.3d at 30.  The state appellate court did not reverse the summary judgment ruling on the merits; rather it held that the trial court should have permitted the plaintiffs to conduct certain discovery prior to ruling.  *Id.*

-3-

Consequently, on April 24, 2015, the Sixth Circuit reversed this Court's dismissal, which had been based on res judicata, because there was no longer a final judgment to which to give preclusive effect. *A Metal Source*, 608 F. App'x at 349. The Sixth Circuit agreed with this Court's determination that Plaintiff had made the Defendant's domain name registration part of the State Action. *Id.* at 347 ("At the close of discovery, the defendants moved for summary judgment on all of the plaintiffs' claims. In response, the plaintiffs partly relied on the defendants' domain name purchases . . . ."). Once the State Action was reinstated, however, there was of course no judgment that could have preclusive effect.

### C. Post-Appeals

On April 24, 2015, upon notification of the Sixth Circuit's reversal and remand, the Court promptly scheduled a teleconference with Plaintiff and Defendants for April 30.[2] The Court's intention was to stay the federal case while the state case proceeded, as any judgment for either Plaintiff or Defendants would likely have had preclusive effect upon the federal case. On April 27, new counsel appeared and substituted as attorney of record on behalf of A Metal. Doc #: 25. On April 29, A Metal voluntarily dismissed the State Action without prejudice, pursuant to Ohio Civ. R. 41(A). *See* Notice of Dismissal, Doc #: 26. During the April 30 teleconference, the Court and counsel discussed possible settlement of the case. During two follow-up teleconferences on May 20 and June 29, the Court and counsel continued discussing ongoing settlement negotiations.

---

[2] The Court initially set the teleconference for April 29, but counsel for Defendants All Metal and Klocker represented that a case management conference in the State Action was scheduled for the morning of April 30 and suggested the teleconference in the instant federal case should follow.

On July 22, 2015, the Court held a settlement conference with the parties and counsel. The conference did not result in a settlement agreement and was scheduled to reconvene on July 30. On July 30, parties and counsel reconvened the settlement conference, but, again, no settlement agreement was reached and the conference was scheduled to reconvene on August 20.

However, on August 18, 2015, A Metal moved to cancel the settlement conference. Doc #: 29. Contemporaneously, A Metal's then-counsel moved to withdraw as attorney. Doc #: 30. On August 20, the Court heard argument on the Motion for Leave to Withdraw; Esparza appeared and opposed her attorney's withdrawal. At the hearing, the Court granted the Motion and afforded A Metal time to retain new counsel. Doc #: 31.

A Metal's third attorneys filed appearances on September 18 and the Court set a teleconference for September 22. At that teleconference, the Court and counsel discussed the case, and A Metal's new counsel was filled in regarding the lengthy case history. The Court gave Defendants thirty days to file a motion for dismissal and/or sanctions.

On October 22, 2015, Defendants filed the instant Motion to Dismiss and for Attorneys' Fees (the "Motion"), Doc #: 36. An opposition response was filed on November 25, a reply was filed on December 14, and a sur-reply was filed on December 22. This Order follows.


**III. Plaintiff's Request to Strike**

In its opposition to the Motion, Plaintiff asks the Court to strike pages thirteen to sixteen of Defendants' supporting memorandum as impertinent and scandalous.

Regarding a *pleading*, "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "Courts

are given considerable discretion in deciding whether to strike portions of pleadings under 12(f).

Courts have generally decided to strike portions of a pleading for being impertinent or scandalous

only where the language is extreme or offensive." *Thompson v. Hartford Life And Acc. Ins. Co.*,

270 F.R.D. 277, 279 (W.D. Ky. 2010) (citations omitted). Regarding *non-pleading materials*,

"[t]he Federal Rules of Civil Procedure do not provide for a motion to strike documents or

portions of documents other than pleadings. Instead, trial courts make use of their inherent

power to control their dockets, *Anthony v. BTR Auto. Sealing Sys.*, 339 F.3d 506, 516 (6th

Cir.2003), when determining whether to strike documents or portions of documents." *Zep Inc. v.*

*Midwest Motor Supply Co.*, 726 F.Supp.2d 818, 822 (S.D.Ohio 2010). "However, motions to

strike are generally disfavored and should only be granted when the material at issue has 'no

possible relation to the controversy.'" *Pate v. MetoKote Corp.*, No. 3:11-cv-209, 2012 WL

5493865, at *4, 2012 U.S. Dist. LEXIS 162032, at *11 (S.D. Ohio Nov. 13, 2012).

At issue is a section of Defendants' memorandum (not a pleading) alleging facts in

support of the sanctions portion of the Motion. While Defendants' language may be

unnecessarily inflammatory, and the Court will disregard any allegations which may be baseless

or irrelevant to the Motion, the Court will not strike the four-page section of the brief.


## IV. Legal Standards

### A. Dismissal

A complaint must allege sufficient facts to compose "a short and plain statement of the

claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In evaluating a Rule

12(b)(6) motion to dismiss, a court construes the complaint in the light most favorable to the

plaintiff, and accepts the complaint's allegations as true, drawing all reasonable inferences in favor of the plaintiff.  *Crugher v. Prelesnik*, 761 F.3d 610, 613 (6th Cir. 2014).  To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  Dismissal with prejudice is inappropriate where "a more carefully drafted complaint might state a claim."  *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 644 (6th Cir. 2003).

### B. Sanctions

"Under 15 U.S.C. § 1117(a), a district court may award reasonable attorney fees to the prevailing party in 'exceptional' cases."  *Eagles, Ltd. v. Am. Eagle Found.*, 356 F.3d 724, 728 (6th Cir. 2004).  An "exceptional" case is "one where a plaintiff brings a suit that could fairly be described as 'oppressive.'"  *Id.*  "The test requires an objective inquiry into whether the suit was unfounded when it was brought and a subjective inquiry into the plaintiff's conduct during litigation."  *Id.*; *accord S Indus., Inc. v. Centra 2000, Inc.*, 249 F.3d 625, 627 (7th Cir. 2001) ("A suit is oppressive if it lacked merit, had elements of an abuse of process claim, and plaintiff's conduct unreasonably increased the cost of defending against the suit.  Under the Lanham Act, an award of attorneys fees is committed to the trial court's sound discretion."); *Nat'l Ass'n of Prof'l Baseball Leagues, Inc. v. Very Minor Leagues, Inc.*, 223 F.3d 1143, 1146 (10th Cir. 2000) ("No one factor is determinative, and an infringement suit could be "exceptional" for a prevailing defendant because of (1) its lack of any foundation, (2) the plaintiff's bad faith in bringing the

suit, (3) the unusually vexatious and oppressive manner in which it is prosecuted, or (4) perhaps for other reasons as well. The Lanham Act largely vests in the district court the discretion to determine when a losing plaintiff's claims or conduct in the litigation are so 'exceptional' as to warrant the assessment of attorney fees.").

## V. Discussion

The Motion argues res judicata, failure to allege facts in support of all elements of each claim, and the oppressiveness of the case.  The Court will address each in turn.

### A. Res Judicata

Res judicata is here inapplicable.

#### 1. Law

In federal court, res judicata may be raised at the Fed. R. Civ. P. 12(b)(6) motion to dismiss phase.  *See City of Canton, Ohio v. Maynard*, 766 F.2d 236, 237 (6th Cir. 1985) (affirming district court's rule 12(b)(6) dismissal on res judicata grounds).

"The federal courts have traditionally adhered to the related doctrines of res judicata and collateral estoppel. Under res judicata, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action. Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Allen v. McCurry*, 449 U.S. 90, 94 (1980) (citations omitted).  "Congress has specifically required all federal courts to give preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged would do

-8-

so . . . ." *Id.* at 96.  Thus, "when considering the preclusive effect of a state court judgment, we must look to the law of that state." *Hamilton's Bogarts, Inc. v. Michigan*, 501 F.3d 644, 650 (6th Cir. 2007).

Under Ohio law, "[t]he doctrine of res judicata encompasses the two related concepts of claim preclusion, also known as res judicata or estoppel by judgment, and issue preclusion, also known as collateral estoppel." *O'Nesti v. DeBartolo Realty Corp.*, 862 N.E.2d 803, 806 (Ohio 2007); *see Anderson v. City of Blue Ash*, 798 F.3d 338, 350–51 (6th Cir. 2015).[3]  All Metal has here argued only issue preclusion.

"Issue preclusion . . . serves to prevent relitigation of any fact or point that was determined by a court of competent jurisdiction in a previous action between the same parties or their privies," and "applies even if the causes of action differ." *O'Nesti*, 862 N.E.2d at 806. Issue preclusion applies when the issue "(1) was actually and directly litigated in the prior action, (2) was passed upon and determined by a court of competent jurisdiction, and (3) when the party against whom [issue preclusion] is asserted was a party in privity with a party to the prior action." *In re Fordu*, 201 F.3d at 704 (alteration in original) (quoting *Thompson v. Wing*, 637 N.E.2d 917, 923 (Ohio 1994)).  "The doctrine of collateral estoppel cannot be invoked when there is no final order." *Glidden Co. v. Lumbermens Mut. Cas. Co.*, 861 N.E.2d 109, 118 (Ohio 2006).

//

//

---

[3] For consistency, outside of quotations, the Court will use the terms "issue preclusion" rather than "collateral estoppel" and "claim preclusion" rather than "estoppel by judgment."

-9-

### 2. Application

It is undisputed that the summary judgment order in the State Action upon that Defendants would rely for issue preclusion was reversed on appeal. By extension, there is no longer a final order. In reversing this Court's claim preclusion ruling, the Sixth Circuit made this clear:

> Here, we are reviewing the federal district court's August 26, 2014 decision giving preclusive affect to the state trial court's June 2, 2014 judgment. During the pendency of this federal appeal, the state trial court judgment was reversed, and the case was remanded for further proceedings. Thus, there is no longer a final state court judgment.

*A Metal Source*, 608 F. App'x at 349. Defendants argue however that, pursuant to *Birgel v. Bd. of Comm'rs of Butler Cty., Ohio*, 125 F.3d 948 (6th Cir. 1997), Plaintiff's voluntary dismissal after remand does not circumvent issue preclusion. The Court disagrees.

### a. No Applicable Binding Ruling

In *Birgel*, the Ohio state trial court granted summary judgment in favor of the defendant. 125 F.3d at 949. Then, the Ohio appellate court reversed the grant of summary judgment (treating that decision as a premature dismissal for failure to state a claim) and remanded to afford the plaintiff a chance to amend. *Id.* (quoting the Ohio appellate court as saying, "While the materials submitted by the plaintiff in support of his motion for a summary judgment were inadequate to establish an enforceable contract, he may have been able to amend his complaint to frame a cause of action for the damages he incurred as a result of the faulty bidding procedure."). After remand, the plaintiff, rather than file an amended complaint, voluntarily dismissed the case and filed a new action in federal court "alleging the identical contract claim." *Id.* Affirming the district court's dismissal of this new federal action, the Sixth Circuit afforded preclusive effect to

the state appellate court's conclusion "on the issue of whether plaintiff may maintain an action

for breach of contract on the facts alleged by the plaintiff." *Id.* at 952.  The *Birgel* court

explained:

> As in *Stoner*, the state appellate court, while remanding the case to the state
> trial court, arrived at a conclusive decision as to plaintiff's breach of contract
> claim.    In the court's opinion, plaintiff's pleadings and proofs were
> insufficient to state a cause of action for breach of contract.  The appellate
> court only remanded the case to afford Birgel an opportunity to construct a
> theory of recovery other than breach of contract to recoup any damages he
> may have incurred.  *See United States v. Harris Trust & Sav. Bank*, 470 F.2d
> 6 (7th Cir.1972) (In a suit to collect federal estate taxes, where the state
> supreme court had three times held that a will was to be interpreted in two
> thirds of decedent's trust estate being a determinable fee, the declarations of
> the state supreme court were binding in the federal court case).
>
> As in *Employees Own Federal Credit Union*, despite the lack of a final
> entered judgment, the Ohio Court of Appeals has spoken "sufficiently firm"
> and, therefore, conclusively on the issue of whether plaintiff may maintain an
> action for breach of contract on the facts alleged by the plaintiff. As we noted
> in *Employees Own Federal Credit Union*, we will not permit a plaintiff to
> abandon his failing state court suit and file a virtually identical suit in federal
> court in hopes of achieving a more favorable result.

*Id.*[4]

Thus, *Birgel* (as well as *Stoner* and *Harris Trust*, which *Birgel* cites) does not, as

Defendants appear to argue, stand for the radical proposition that a voluntary Rule 41(A)

dismissal revives the preclusive effect of an already-overruled trial court judgment.  Rather,

---

[4] In *Stoner v. New York Life Ins. Co.*, the state appellate courts twice reversed trial court
verdicts because of incorrect jury instructions, but each time "expressly stated that the evidence
as to total disability presented a question for the jury."  311 U.S. 464–68 (1940).  Before either
case was retried in state court, the insurance company sought declaratory judgment in federal
court, and the Eight Circuit ruled that Stoner was not totally disabled.  *Id.*  In *Stoner*, "[t]he
Supreme Court held that the Eighth Circuit erred in failing to follow the two decisions of the
state court of appeals which had held there was a sufficient jury question as to whether Stoner
was disabled."  *Birgel*, 125 F.3d at 951.

*Birgel* stands for the far less dramatic proposition that a sufficiently detailed state appellate decision overruling a final judgment, though not actually a final judgment itself, may yet have preclusive effect.  Specifically, in *Birgel*, the state appellate court reversed for a procedural reason but *also* firmly stated a conclusion regarding the facts of that case, i.e., "the materials submitted by the plaintiff in support of his motion for a summary judgment were inadequate to establish an enforceable contract."  125 F.3d at 949.  Thus, the question for this Court in applying *Birgel* is not whether the *trial court's* summary judgment order is sufficiently detailed but rather whether the *appellate court's* reversal order qualifies as a "prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded conclusive effect." *Employees Own Fed. Credit Union v. City of Defiance, Ohio*, 752 F.2d 243, 245 (6th Cir. 1985) (quoting Restatement (Second) of Judgments § 13 (1982)).  It does not.

  *Birgel* is here inapposite because the Ohio appellate court has not "spoken 'sufficiently firm.'"  *Birgel*, 125 F.3d at 952. Here, unlike in *Birgel* and *Stoner*, the state appellate court decision does not state grounds upon which this Court can preclude the instant case.  The state appellate court had before it five assignments of error; it sustained one assignment as dispositive, rejected one, and declined to discuss the remaining three because they were moot.  *Esparza*, 27 N.E.3d at 30 ("Based on our disposition of the fourth assignment of error, the first, second, and third assignments of error, which deal with the trial court's decision to grant summary judgment in favor of Klocker and All Metal Sales, are moot.").  Here, while, as Defendants correctly note,

//

//

//

-12-

the state appellate court reversed on a narrow discovery issue (i.e., "[t]he trial court erred in granting a blanket protective order and quashing the first subpoena upon AT & T, dated January 14, 2014." *Esparza*, 27 N.E.3d at 30), the state appellate court did not make any firm statement on the merits, and, in fact, reversed without commenting on the merits whatsoever.[5]

Thus, because the appellate court declined to clearly demonstrate firm approval (or disapproval) of any part of the trial court's reasoning or otherwise state a firm conclusion outside two narrow discovery assignments of error, the appellate decision has no applicable preclusive effect in the instant case.

In sum, the trial judge's summary judgment is no more; only the appellate decision stands and may, per *Birgel*, carry preclusive weight.  Because nothing in the Ohio appellate court's decision speaks conclusively on the matters before this Court, issue preclusion pursuant to *Birgel* is here inappropriate.

### b. Final Judgment Mandatory

Though *Birgel* is here inapposite, as discussed above, the Court also notes, in passing, its concern that the *Birgel* final-judgment exception may no longer be good law as applied to Ohio state court judgments.

---

[5] Defendants cite paragraph twenty-seven of the appellate decision for the proposition that "Ohio's Eighth District Court of Appeals agreed with the trial court that A-Metal had no evidence to support its claims."  Mem. in Support of Mot. to Dismiss 4, Doc #: 36-1.  However, such a conclusion is a misreading of the opinion.  In full, the appellate court said, "{¶ 27} We also find no merit to Klocker's claim that Esparza should be prohibited from subpoenaing the AT & T records because they would have been produced after the discovery deadline, the parties had already taken depositions and completed extensive discovery, and Esparza was unable to show any evidence to support her claims for relief."  *Esparza*, 27 N.E.3d at 29.  Read carefully and in context with paragraph twenty-eight, it is clear that the court is *not* saying that Esparza had no evidence, rather that the court discounted such arguments regarding the subpoenas.

Federal courts, when considering the preclusive effect of a state court's judgment, look to the law of that state and not to federal law. *Hamilton's Bogarts*, 501 F.3d at 650. In deciding *Birgel*, the Sixth Circuit observed that "[o]rdinarily, res judicata and collateral estoppel both require a final judgment . . . . Our Court, however, has applied collateral estoppel even where a final judgment has not been entered," and then described the applicable precedential case, *Employees Own*, 752 F.2d 243. The *Birgel* court specifically noted that in *Employees Own*, "[w]ithout Ohio law on point, our Court looked to general principles of collateral estoppel and specifically to The Restatement (Second) of Judgments . . . ." to conclude that "because the state [appellate] court 'issued an opinion with detailed findings of fact and conclusions of law based on pretrial affidavits, depositions, and trial briefs . . . that decision is sufficiently firm to be accorded conclusive effect.'" *Birgel,* 125 F.3d at 951–52 (second alteration in original) (quoting *Employees Own*, 752 F.2d at 245).

However, since the time when *Birgel* was decided, the Ohio Supreme Court has fleshed out state res judicata law. Specifically, in 2006, the Ohio Supreme Court made the unequivocal and categorical statement of law—appearing both in the opinion *and the syllabus*—that, "[t]he doctrine of collateral estoppel cannot be invoked when there is no final order." *Glidden*, 861 N.E.2d at 111, 118. *Glidden*, decided almost twenty years after *Birgel*, casts serious doubt on whether Ohio law presently accommodates the *Birgel* (or any other) exception to the issue preclusion final-judgment requirement.

Having ruled that *Birgel* does not apply to the specific facts of this case, however, the Court need not presently determine its broader Ohio applicability. Issue preclusion does not bar Plaintiff's claims.

-14-

### B. Failure to Plausibly State all Elements of a Claim

#### 1. Cybersquatting

Cybersquatting, pursuant to 15 U.S.C. § 1125(d), comprises five elements: a trademark owner must establish "(1) it has a valid trademark entitled to protection; (2) its mark is distinctive or famous; (3) the defendant's domain name is identical or confusingly similar to, or in the case of famous marks, dilutive of, the owner's mark; and (4) the defendant used, registered, or trafficked in the domain name (5) with a bad faith intent to profit." *DaimlerChrysler v. The Net Inc.*, 388 F.3d 201, 204 (6th Cir. 2004).

Primarily at issue here is the applicability of the "with a bad faith intent to profit" element of the statute. Section 1125(d)(1)(B)(i) indicates that "[i]n determining whether a person has a bad faith intent described under subparagraph (A), a court may consider factors such as . . . ." and list nine factors. These factors are not mandatory. *Sporty's Farm L.L.C. v. Sportsman's Mkt., Inc.*, 202 F.3d 489, 498 (2d Cir. 2000); *Virtual Works, Inc. v. Volkswagen of Am., Inc.*, 238 F.3d 264, 269 (4th Cir. 2001) ("We need not, however, march through the nine factors seriatim because the ACPA itself notes that use of the listed criteria is permissive.").

#### a. The Factors for Bad Faith

The ACPA lists nine factors the court may wish to consider in determining whether a person has a bad faith intent. 15 U.S.C. § 1125(d)(1)(B)(i).

> The first four factors are those that militate against a finding of bad faith by providing some reasonable basis for why a defendant might have registered the domain name of another mark holder. These factors focus on: whether the defendant has trademark or other rights in the domain name; the extent to which the domain name consists of the defendant's legal name or other common name; any prior use of the domain name for the offering of goods and services; and the bona fide noncommercial use of the site. . . .

-15-

> Factors five through eight are indicative of the presence of bad faith on the part of the defendant. These factors focus on: whether the defendant seeks to divert consumers from the mark holder's online location either in a way that could harm good will or tarnish or disparage the mark by creating a confusion regarding the sponsorship of the site; whether there has been an offer to transfer or sell the site for financial gain; whether the defendant provided misleading contact information when registering the domain name; and whether the defendant has acquired multiple domain names which may be duplicative of the marks of others.

*Lucas Nursery & Landscaping, Inc. v. Grosse*, 359 F.3d 806, 809–10 (6th Cir. 2004).  The ninth factor is "the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous," which can militate toward or away from bad faith.  15 U.S.C. § 1125(d)(1)(B)(i)(IX).

A brief review of these factors as applied to this case demonstrates that these factors are of limited applicability when no use of domain names is alleged.  The first four factors that might militate against a finding of bad faith fail to do so.  Specifically, the first two factors appear to favor Plaintiff, as the marks and legal name of Plaintiff appear in several of the domain names.  The third and fourth factors address prior and current use of the domain names, but here there is no use alleged at all.  Thus, while these factors fail to militate against a finding of bad faith, because there is no use, these factors also cannot meaningfully indicate the presence of bad faith.  Particularly, regarding the fourth factor, deciding whether that non-use either qualifies as noncommercial use or fair use or does not so qualify borders on nonsensical.

Again, tellingly, three of the four remaining factors that might indicate the presence of bad faith also clearly fail to do so.  Specifically, the fifth and sixth factors favor the Defendants, as no attempt to divert customers or sell the domain names has been alleged.  The seventh factor

-16-

also favors Defendants, as they are alleged to have registered with the correct contact information of an All Metal employee, albeit concealed.  Compl. ¶ 21; *see Career Agents Network, Inc. v. careeragentsnetwork.biz*, No. 09-CV-12269-DT, 2010 WL 743053, at *5, 2010 U.S. Dist. LEXIS 17263, at *15 (E.D. Mich. Feb. 26, 2010) ("Use of the privacy protection service is not the same thing as providing false or misleading contact information").  The one outlier is the eighth factor, as there were multiple registrations, which may indicate bad faith.[6]

Clearly, the enumerated optional factors are not well suited to the analysis of domain names which are registered but not actually used, and consequently the factors neither affirm nor negate bad faith, here.  Before the Internet domain names were registered by Defendants, they were registered by no one.  Thus, these domain names are alleged to have gone nowhere prior to being registered by Defendants, and after registration by Defendants, the domain names still are alleged to go nowhere.  In effect, the status quo is unchanged, except now the Defendants are paying to maintain it.

### b. Intent to Profit

As indicated in the brief discussion of the factors, the fifth and sixth factors here fail to demonstrate the two means by which Defendants are alleged to intend to profit from these domain name registrations.  Defendants argue the failure to demonstrate intent to profit is dispositive not because of these factors but because the intent to profit is an *element* of the claim. Specifically, the parties argue whether "it was incumbent on A Metal Source, as a matter of law,

_____

[6] The Court declines to comment on the ninth factor, distinctiveness/famousness of the mark, on the basis of the Complaint's allegations alone.  The Court notes, however, that, given the inconclusiveness of the other eight factors, this factor would be unlikely to tip the analysis either direction.

to plead facts demonstrating All Metal Sales' intent to subsequently use or sell the domain names it registered." Sur-Reply 2, Doc #: 43. The Court holds that it is.

The Court notes first that the plain language of the statue states that a "profit" intent is required. The ACPA, § 43(d) of the Lanham Act, provides, "A person shall be liable . . . by the owner of a mark . . . if . . . that person . . . has a bad faith intent to profit from that mark . . . ; and . . . registers, traffics in, or uses a domain name that . . . is identical or confusingly similar to that mark." 15 U.S.C. § 1125(d)(1)(A).

While the Sixth Circuit has not discussed the "bad faith intent to profit" element in great detail, the court quoted a district court opinion with approval in saying, "Congress passed the ACPA . . . to prohibit 'cybersquatting.' As the district court noted, 'cybersquatting' occurs when a person other than the trademark holder registers the domain name of a well known trademark and then attempts to profit from this by either ransoming the domain name back to the trademark holder or by using the domain name to divert business from the trademark holder to the domain name holder." *DaimlerChrysler v. The Net Inc.*, 388 F.3d 201, 204 (6th Cir. 2004).

Discussing the "bad faith intent to profit" element at much greater length, the Eleventh Circuit has concluded "intent to profit" is necessary and extends beyond mere bad faith in general. *Southern Grouts & Mortars, Inc. v. 3M Co.*, 575 F.3d 1235, 1243–1250 (11th Cir. 2009). Specifically, in *Southern Grouts*, the court observed, "Proving 'bad faith' is not enough. A defendant is liable only where a plaintiff can establish that the defendant had a 'bad faith *intent to profit*.' We cannot read the words 'intent to profit' out of the statute." *Id.* at 1246 (citations omitted) (quoting 15 U.S.C. § 1125(d)). The court then cited the The Senate Report accompanying the ACPA and noted, "[t]he report says nothing about those who hold onto a

-18-

domain name to prevent a competitor from using it." *Id.*  The court noted that holding domain names for ransom was the "paradigmatic harm" but also observed that a defendant could intend to profit by using a trademark infringing domain name to divert customers to its own website. *Id.* at 1246–47.

> The Eleventh Circuit summarized its analysis in a recent case:
>
>> The ACPA was enacted to prevent cybersquatting.  Cybersquatting is essentially extortion.  Cybersquatting can take the form of "register[ing] numerous domain names containing . . . trademarks or tradenames only to hold them ransom in exchange for money."  Another form of cybersquatting occurs when the cybersquatter "intend[s] to profit by diverting customers from the website of the trademark owner to the defendant's own website, where those consumers would purchase the defendant's products or services instead of the trademark owner's."  In a sense, the cybersquatter muddies the clear pool of the trademark owner's goodwill and then profits off the resulting murkiness.

*Jysk Bed'N Linen v. Dutta-Roy*, No. 13-15309, 2015 WL 8999502, at *4, 2015 U.S. App. LEXIS 21780, at *12–13 (11th Cir. Dec. 16, 2015) (alterations in original) (citations omitted).  *See also Am. Univ. of Antigua Coll. of Med. v. Woodward*, 837 F. Supp. 2d 686, 693 (E.D. Mich. 2011) ("The last element does not simply require a finding of bad faith . . . but 'a bad faith *intent to profit*.'"); *DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1224 (9th Cir. 2010) ("Even if a domain name was put up innocently and used properly for years, a person is liable under 15 U.S.C. § 1125(d) if he subsequently uses the domain name with a bad faith intent to profit from the protected mark by holding the domain name for ransom.").  This Court finds the Eleventh Circuit's analysis persuasive: the bad faith intent must specifically include an intent to profit.

Here, Plaintiff only alleges that Defendant registered certain domain names which Plaintiff alleges infringe on its protected marks.  Compl. ¶¶ 19, 21, 22.  The Complaint does not

allege that Defendants directed the domain names to send visitors to web sites which would profit Defendants or confuse customers, nor does the Complaint allege Defendants offered to sell the domain names to Plaintiff or anyone else.  In fact, the Complaint does not allege that Defendants used or intended to use the domain names in any way that could have generated economic gain.

Southern Grouts specifically addressed the question of the registration of a domain name "not to display content, but to prevent others from registering it," and the court held that such conduct does not violate the law.  *Southern Grouts*, 575 F.3d at 1245–47.  Plaintiffs try to distinguish *Southern Grouts* on the basis that in that case the Defendant had a prior legitimate use of the domain name and the defendant there only registered a single offending domain. However, given the unequivocal and repeated language in *Southern Grouts* regarding proving specifically an intent to profit, the Court must disagree.  In *Southern Grouts*, after summarizing Plaintiff's "unique circumstance" that the Defendant registered the domain name only to prevent someone else from registering it, the court observed "[t]his circumstance does not, however, tip our analysis toward a conclusion that 3M has violated the Anticybersquatting Consumer Protection Act.  Proving 'bad faith' is not enough. A defendant is liable only where a plaintiff can establish that the defendant had a 'bad faith intent to profit.'"  *Id.* at 1245–46.  *Southern Grouts* does not stand for the proposition that registration for the sole purpose of blocking another's use is not bad faith but rather that, absent other facts suggesting economic use, such blocking is not bad faith intent to profit.

Plaintiff further suggests that *Sporty's Farm* and *DiamlerChrysler* are more factually parallel to the instant case.  While the courts in each of these cases considered many factors in

evaluating "bad faith intent to profit," in both decisions the court found indicia of an intent to profit.  In *Sporty's Farm*, the domain name was used to direct to a website that sold Christmas trees and the infringing parry, Sporty's Farm/Omega, did not claim the use was noncommercial. *Sporty's Farm*, 202 F.3d at 492, 499.  In *DiamlerChrysler* the defendant "claim[ed] that he planned to use the 'foradodge.com' domain name to establish a website that described his 'dodging' services such as asset protection, tax and creditor avoidance, and ways to bypass 'society's general paradigm. . . .  From at least February 1998, and possibly as early as December 1996, to about October 1998, the defendants pointed the 'foradodge.com' domain name to a website that contained a link to a pornographic website.'"  388 F.3d at 203–04.

Here, no bad faith intent to profit is alleged in the Complaint.  In short, there are no allegations in the Complaint that Defendants have in any way used these domain names.  There are no allegations that Defendants intend to profit by these domain names through sale, ransom, direction to websites, or otherwise.  During the pendency of the State Action, Plaintiff failed to produce any evidence that Defendants used—or even intended to use—the domain names in any way.

Furthermore, in opposing the Motion, Plaintiffs have not argued that Defendants in any way intend to profit.  Plaintiff does posit, "[i]t defies logic to infer from the facts that All Metal Sales did not intend to profit by its registration of 91 domain names to the exclusion of its competitor, A Metal Source."  Sur-Reply 2.  But Plaintiff is incorrect.  In this "ongoing feud between Esparza and Klocker," *Esparza*, 27 N.E.3d at 25, it is entirely plausible that the accused domain names were registered for no purpose other than the petty irritation of a step-sibling.  However, in evaluating the instant motion to dismiss, the Court need not ascertain what purpose

-21-

underlay the alleged domain name registrations. Rather, the Court need only decide what the

Complaint *does not* allege regarding the registrations: "a bad faith intent to profit."

Having found the "bad faith intent to profit" element missing, the Court need not and

does not comment on any other elements. The Complaint does not allege a claim for

cybersquatting, pursuant to 15 U.S.C. § 1125(d), upon which relief can be granted.

### 2. Unfair Competition

In relevant part, the Lanham Act creates civil liability for unfair competition when a party

confuses or deceives consumers into believing goods or services are affiliated, specifically,

> [a]ny person who, on or in connection with any goods or services, or any
> container for goods, uses in commerce any word, term, name, symbol, or
> device, or any combination thereof . . . which . . .
>> (A) is likely to cause confusion, or to cause mistake, or to deceive as
>> to the affiliation, connection, or association of such person with
>> another person, or as to the origin, sponsorship, or approval of his or
>> her goods, services, or commercial activities by another person . . . .

15 U.S.C. § 1125(a)(1). The Lanham Act defines "use in commerce" as "the bona fide use of a

mark in the ordinary course of trade, and not made merely to reserve a right in a mark." 15

U.S.C. § 1127. A mark is used in commerce when "it is placed in any manner on the goods or

their containers or the displays associated therewith . . . or . . . on documents associated with the

goods or their sale" or "when it is used or displayed in the sale or advertising of services . . . ."

*Id.* The Court finds that Plaintiff has not alleged that Defendants used the domain names in

commerce. Use in commerce requires more than mere registration of a domain name. *Juno

Online Servs. v. Juno Lighting, Inc.*, 979 F. Supp. 684, 691 (N.D. Ill. 1997) ("The mere

'warehousing' of the domain name is not enough to find that defendant placed the mark on goods

or 'used or displayed [the mark] in the sale or advertising of services' as required."), *cited by*

-22-

*Bird v. Parsons*, 289 F.3d 865, 878 (6th Cir. 2002).  Here, as discussed in the preceding sections, the Complaint does not allege that the Internet domain names have been used in any way, simply registered.  This is insufficient for use in commerce, as is required.

Numerous courts have similarly concluded that merely registering domain names is not enough to demonstrate use in commerce.  *E.g. Taubman Co. v. Webfeats*, 319 F.3d 770, 775 (6th Cir. 2003) ("As long as [defendant] has no commercial links on either of his websites . . . we find no use 'in connection with the advertising' of goods and services to enjoin, and the Lanham Act cannot be properly invoked."); *Compak Companies, LLC v. Johnson*, No. 03 C 7427, 2011 WL 686263, at *3, 2011 U.S. Dist. LEXIS 16814, at *10 (N.D. Ill. Feb. 17, 2011) ("Merely acquiring a domain name is not a commercial use."); *Cline v. 1-888-PLUMBING Grp., Inc.*, 146 F. Supp. 2d 351, 369 (S.D.N.Y. 2001) ("In the context of internet domain names, parties encroach on a registrant's rights under § 32(1) of the Lanham Act not when they reserve a domain name likely to be confused with the registered mark, but when they *use* it."); *HQM, Ltd. v. Hatfield*, 71 F. Supp. 2d 500, 507 (D. Md. 1999) (collecting cases).

Accordingly, the Complaint does not properly allege a claim for unfair competition, pursuant to 15 U.S.C. § 1125(a)(1).

### C. Impermissible Forum Shopping

The manner of the prosecution of this case raises, for this Court, serious concerns about impermissible forum shopping.

This Court previously dismissed the instant case on the basis of claim preclusion, specifically noting that the domain name registrations underlying Plaintiff's Lanham Act claims had been included in the state court's summary judgment ruling and any such claims could have

-23-

been brought in the state court.  While Plaintiff discussed with Defendants the possibility of amending the state claim to include the Lanham Act claims in the State Action, Plaintiff did not move the state court judge to do so.  Opp. to (First) Mot. to Dismiss 4, Doc #: 17; Pl.'s Brief Re. Pending Lawsuit 4, Doc #: 7; State Court Docket, Doc #: 16-3.  Plaintiff did, however, "partly rel[y] on the defendants' domain name purchases" in arguing their State Action claims.  *A Metal Source*, 608 F. App'x at 347; *accord Esparza*, 27 N.E.3d at 26.

Once Plaintiff succeeded in getting the state appellate court to remand the State Action, the appropriate course of action was for Plaintiff to obtain the discovery to which the state appellate court had ruled it was entitled, and then for Plaintiff to file another opposition brief to Defendants' summary judgment motion.  This Court would have stayed the instant matter while the State Action proceeded.  If Plaintiff had prevailed at the summary judgment stage, Plaintiff would have had a trial on her claims that would have included factual findings regarding the domain names.  Or, the state court judge may have again granted summary judgment.  Regardless of the outcome, however, the State Action would have resulted in a binding judgment which very likely would have had preclusive effect in the federal case.  Defendants' domain name registrations would not have been litigated in federal court.  Instead, on April 29, 2015, three months after winning the state appeal and one day before scheduled conferences in this Court and the state trial court, Plaintiff chose to abandon the State Action, without prejudice, and try its hand in federal court.  The Court believes this is improper.

The basic principle at issue is that a litigant gets only one bite at the apple—he or she may not  litigate a claim based on a specific set of facts more than once.  The principle is effected, in some cases, by the doctrine of res judicata.  *See, e.g.*, *Employees Own*, 752 F.2d at 245 ("The

Credit Union had a full and fair opportunity to litigate its claim in state court, and we see no reason to allow a party to get an adverse judgment in state court and turn around and sue on the same claim in federal court. One bite at the apple is enough.").  However, when a litigant abandons one litigation, after an adverse ruling is reversed but before it is re-adjudicated, to pursue matters in another court—as Plaintiff has here—that litigant abuses procedure, wastes judicial resources, and unfairly causes the opponent to incur substantial expense.

What happened here is as follows.  Plaintiff and Defendants engaged in extensive discovery in the State Action.  While the litigation was pending, Plaintiff filed this case. Defendant moved for summary judgment, which the state judge granted.  Plaintiff successfully overturned the state court's ruling: the appellate court said Plaintiff was entitled to additional discovery.  At that point, Plaintiff dismissed the State Action, likely recognizing that the additional discovery would not do Plaintiff much good, and decided to litigate the same domain name conduct under federal causes of action in federal court.

The Ohio Rules, specifically Ohio Civ. R. 41(A), permit a plaintiff to dismiss its case once without prejudice and without leave of the court, at any time.  That privilege is absolute even though it is subject to abuse.  *State ex rel. Richard v. Cuyahoga Cty. Bd. of Commrs.*, 654 N.E.2d 443, 445 (Ohio Ct. App. 1995).  That being said, a federal court need not turn a blind eye to what has happened here.

It is impermissible forum shopping to bring claims based on the same facts in different lawsuits before two courts and then to go back and forth between those two courts depending on one's sense of how the wind is blowing.

-25-

**VI. Conclusion**

    **A. Motion to Dismiss**

    For the reasons discussed above, the Court GRANTS IN PART Defendants' Motion to Dismiss and for Attorneys' Fees, Doc #: 36.  Because the Court does not find res judicata bars Plaintiff's claims, the Court dismisses both claims in the Complaint for failure to state a claim, *without prejudice*.

    **B. Motion for Sanctions**

    As described above, Plaintiff's Lanham act claims lacked foundation when filed because the Complaint does not allege Defendants have used the domain names in commerce, as required for the unfair competition claim, or with bad faith intent to profit, as required for the cybersquatting claim, and at no time subsequent to filing the Complaint has Plaintiff alleged or argued the existence of any such use.  Furthermore, the facts underlying this federal Complaint were already being litigated in the State Action at the time they were brought in this Court.  Finally, the Court notes that Plaintiff's forum shopping in this litigation has resulted in litigation spanning four courts over three years and made the case unnecessarily resource-intensive for both the courts and parties.

    For these reasons, the Court finds that further litigation of this case in federal court should not be permitted unless Plaintiff first pays Defendants' costs and attorneys fees in the abandoned State Action.  Plaintiff can of course avoid the imposition of sanctions by refiling the State Action.  Should Plaintiff refile the federal case, or in the event the court of appeals reinstates the case, the sanctions will be imposed.  Accordingly, if the case is refiled or reinstated, Defendants shall file a pleading detailing the attorneys fees and costs they incurred defending the State

Action in both the trial court and the state court of appeals.  Plaintiff may respond if it believes these fees and costs are excessive.  The Court will then issue its ruling as to the amount Plaintiff must pay before the federal case would be permitted to proceed.

To be clear, Plaintiff must pay Defendants' attorney's fees and costs *if and only if* Plaintiff goes forward with the federal case.

**IT IS SO ORDERED.**

*/s/ Dan A. Polster    Jan. 21, 2016*
**DAN AARON POLSTER**
**UNITED STATES DISTRICT JUDGE**

-27-